GRAND INTERNATIONAL BROTHER-HOOD OF LOCOMOTIVE ENGINEERS et al., Appellants,

v.

S. C. WILSON et al., Appellees.

No. 16145.

Court of Civil Appeals of Texas.

Fort Worth.

Nov. 18, 1960.

Rehearing Denied Dec. 16, 1960.

Hornbeck, Ritter & Victory, Cleveland, Ohio, Willis & Willis, and William P. Fon-ville, Dallas, for appellants Grand International Brotherhood of Locomotive Engineers, T. H. Bendy and L. E. Croft.

Tilley, Hyder & Law, and Thompson, Walker, Smith & Shannon, and Wyndall R. Johnson, Fort Worth, for appellants Chicago, Rock Island and Pacific Railroad Co. and Fort Worth & Denver Railway Co.

Harris & Ball, and Chester G. Ball, Arlington, for appellees.

MASSEY, Chief Justice.

The matter of state court jurisdiction of this cause of action has been before us on a previous occasion. See Choate v. Grand International Brotherhood of Locomotive Engineers, Tex.Civ.App.1957, 307 S.W.2d 854, in which opinion we sustained the trial court's judgment of dismissal under the theory that exclusive jurisdiction of the controversy is vested in the Adjustment Board by the Railway Labor Act, 45 U.S.C.A. § 153, par. First, subd. (i). Writ of error was granted by the Supreme Court and the judgments of the trial court and this court were reversed, the cause of action being remanded for trial. See Choate v. Grand International Brotherhood of Locomotive Engineers, Tex.1958, 314 S.W.2d 795.

The instant appeal follows the trial in the court to which the cause was remanded. It was conducted before a jury to which a single issue was submitted, as follows: "Do you find from a preponderance of the evidence that the decision of the grand Chief Engineer, dated January 19, 1954, and the decision of the Grand International Brotherhood of Locomotive Engineers, at its 1956 Triennial Convention, holding that the allocation of work on the Dallas-Irving Switchers was controlled by the 1933 agreement, and should be divided one-third to Rock Island, and two-thirds to Burlington-Rock Island engineers, was arbitrary and capricious as those terms are defined above?" Based upon an affirma-

tive, or "yes", finding of the jury, the trial court entered judgment in behalf of the members of Local 187, Grand International Brotherhood of Locomotive Engineers, appellee-plaintiffs, and against the parent body and the carriers named as parties defendant along with it and its interested agents and affiliated persons.

We have concluded that there was no evidence that the decisions inquired about in the special issue, and especially that of the Convention, were arbitrary and capricious. Therefore, the judgment of the trial court must be reversed and a take-nothing judgment rendered against appellee-plaintiffs.

■ Certain points on appeal contend that in view of certain amendments of the pleadings in the case a change had occurred between the time of the Supreme Court's opinion in Choate v. Grand International Brotherhood of Locomotive Engineers, supra, and the time of the trial below from which this appeal was taken, and that in view of the change the issues involved a controversy and dispute between railroad employees and a carrier. Therefore, it is contended that the Supreme Court's holding has become inapplicable and that the exclusive jurisdiction of the controversy is vested in the Adjustment Board by the Railway Labor Act, 45 U.S. C.A. § 153, par. First, subd. (i). We have examined the pleadings and the evidence and in view thereof overrule the contentions. We do not believe the vigor with which the carriers and other interested parties have endeavored to convert the controvery into such a dispute, effecting such a transfer of jurisdiction, has been successful. The trial court had jurisdiction and this court has jurisdiction of the appeal.

The events giving rise to this controversy are related in the pleadings. In 1933 four railroad brotherhoods entered into an agreement to regulate the manning of trains between Fort Worth and Teague. At that time the Rock Island was operating

between Fort Worth and Dallas, the M. K. & T. between Dallas and Waxahachie, and the Burlington-Rock Island between Waxahachie and Teague. In so far as it relates to this suit, the only track then in operation was that running from Fort Worth to Teague. The agreement provides that the first five freight crews operating in the territory between those two points shall be prorated between Rock Island, Burlington-Rock Island and Fort Worth & Denver engine and train service employees in accordance with a tabulation and certain examples set out in Article 1 of said agreement. As the situation stood in 1933, the distance operated over Burlington-Rock Island track from Teague to Waxahachie was 67 miles, and the distance operated over Rock Island rails from Fort Worth to Dallas was 34 miles. It was accordingly provided that all regular and extra freight crews above five in the territory covered by the contract would be apportioned on a mileage basis as follows: Burlington-Rock Island $66\frac{2}{3}\%$ and Rock Island $33\frac{1}{3}\%$. Appellee-plaintiffs contend that the sole purpose of this agreement was to enable trains to run from Fort Worth to Teague without the necessity of changing crews.

It is of interest to note that there had been an earlier agreement of the parties. In the initial agreement, in 1930, the provisions thereof relating to the trackage between Fort Worth and Teague were as to "All through freight service". It was mentioned at an earlier part of the same instrument that between Fort Worth and Dallas "the freight service operated between those points by the CRI&G (the Rock Island) is handled by one crew in turn-around service". It was further stated therein that the carriers "desired to operate the freight business between Fort Worth and Teague with pool crews". In the first portion of the 1933 agreement (under which all interested parties operated without controversy until 1948, when there was a rather sudden increase in industrial switching in the Dallas-Irving area

due to the location of industries therein and the operation by the Rock Island of switching service to these industrial sites), it was stated that said 1933 agreement had become necessary as the result of complaints originating under the 1930 agreement, changes in the service contemplated thereunder to be performed having given rise to inequities, etc. Thereafter, provisions in the 1933 agreement spoke of "freight service *in the territory* between Fort Worth and Teague". (Emphasis supplied.) All the provisions of the agreement relative to apportionment of work, as applied to freight service, included the words "in the territory", as applied to work to be performed between Fort Worth and Teague.

There was no industrial switching between Fort Worth and Teague when the 1933 contract was executed. Since that time, however, the Rock Island has constructed approximately 60 miles of switch track leading to industrial sites in and around the Dallas-Irving area. This switch track, on both sides of and connecting up with the Rock Island main track, is owned exclusively by Rock Island and only that railroad operates trains on it. These are not through trains, and no business other than that of Rock Island is handled thereby. Coincidently with the establishment of these industrial locations, in the year 1948, the local union (No. 187) of Rock Island engineers, a subsidiary of the Grand International Brotherhood, unilaterally entered into an agreement with Rock Island by the terms of which engineers employed by that railroad would handle all trains on the switcher tracks in the Dallas-Irving area.

It was in this 1948 contract that there was originated the controversy between the local union (No. 187) of Rock Island engineers, appellee-plaintiffs, and the Grand International Brotherhood et al. (the chairmen of its grievance committees for the various carriers' employee groups, etc.). By said contract the members of said local union obtained exclusive rights to service the "Rock Island Switchers", i. e., the work of industrial switching on the Rock Island tracks serving the Dallas-Irving Industrial Area. The growth of the area was quite rapid and productive of a constantly increasing amount of work in industrial railroad switching. It is clear from the evidence in the record that there is no question but that it is "freight service" performed by "road switchers", as distinguished from "yard switchers", although there was room to make factual determination as to whether the area was "in the territory between Fort Worth and Teague" on the Rock Island tracks. As an analogy, the situation was similar to a hypothesized situation where what had once been a simple one or two industry "road switcher" connection grew and expanded, due to new industrial locations properly served by the same or additional "road switcher" trackage, to such an extent that it became a major rather than a minor railroad operation and presented a condition which had not originally been anticipated at a time before the growth occurred.

All other railroad employees and union members, in particular those of the Burlington-Rock Island local, took the position that the 1933 agreement applied to the work performed on the "Dallas-Irving Switchers", and that the assumption of all this work by the appellee-plaintiffs was in violation of the agreement. It is worthy of note that by the provisions of the 1948 contract the appellee-plaintiffs assumed all the liability and responsibility to make whole the other union members in the event it should ultimately be determined that the apportionment of work on the "Dallas-Irving Switchers" should be under the 1933 agreement. Under the provisions of applicable union Constitutions and By-Laws, which need not be detailed, the ultimate arbiter of the dispute was the Triennial Convention of the parent body, the Grand International Brotherhood, itself, delegates to which Convention being elected by and representing all of the railroad engineers of the United States and Canada.

Without detailing the steps in the exhaustion of remedies within the body of its in-

ternal organizations, it is to be noted that the case was appealed all the way to the Triennial Convention, where the decision was returned against Local 187, appellee-plaintiffs. Thereafter, they filed their suit in the District Court of Tarrant County, Texas. Their efforts were necessarily directed to obtaining final declaration that the 1933 agreement was without application to the work on the "Dallas-Irving Switchers", and that the decision of the Triennial Convention, that said 1933 agreement did have application to such work and operated to control the work and entitlement thereto as apportionable between them and the Burlington-Rock Island employees, was arbitrary and capricious and therefore unreasonable. If they could succeed in this the determination made by the Grand International Brotherhood could be avoided, its decree declared void and the 1933 agreement excluded from consideration as a controlling factor of the work on the "Dallas-Irving Switchers". Ipso facto their 1948 agreement with the Rock Island company would be validated and they would have the exclusive right to perform the work in question.

■■■  We must, of course, beware of any disposition to embark upon an independent contractual construction. Contractual construction is, of course, involved at the foundation of the controversy, and we believe that it would be determinable through decision upon the facts as well as law. In view of the agreement of all actual parties at interest, the union members were bound to exhaust remedies within their own organization before they would be entitled to seek relief in the courts. These parties must be held to have agreed to the ultimate arbitration of their dispute by the Triennial Convention of the Grand International Brotherhood. In the decision of said arbitration body appellee-plaintiffs found cause for complaint, and by their petition for relief in the trial court they alleged that said decision was void in that it was arbitrary and capricious and not based upon any relevant differences. Of necessity, we must, in the awareness of the provisions of the 1933 agreement and of appellee-plaintiffs' unilateral contract with the Rock Island in 1948, direct our examination of the case on appeal to the evidence upon the action taken by the aforesaid arbiter of the dispute, in the determination of whether that body's action was arbitrary and capricious and therefore unreasonable. Unless the evidence raises the issue, it is not within the province of the courts to disturb the decision of the arbiter, and in that event our judgment would necessarily be one of reversal and rendition.

■■■  One distinction to be made is of arbitrary and capricious action as distinguished from a mere mistaken conclusion. And we have reached the conclusion that the most that could be said in this case in explanation of the decision of the Triennial Convention would merely be that it was an erroneous conclusion. There is no evidence that the upholding of the Grand Engineer's decision by the decision of the Triennial Convention was the result of arbitrary or capricious action. On the contrary, the evidence shows the exercise of good faith in the consideration given to the case by that body and by the Grand Engineer, whose adverse decision was brought before all the union delegates by the appellee-plaintiffs, in their appeal to the Convention. That body, through committee appointed for the purpose, reviewed the entire history of the controversy, the circumstances giving rise thereto, developments, and changes in all the contracts and agreements, as well as in the industrial activity and its effect upon the amount of the work thereby afforded to the members of the interested groups of workmen. The representative who submitted the case in behalf of appellee-plaintiffs testified in the trial court and stated he was given a fair hearing and was allowed three days to present and argue in behalf of his principals. The committee's hearing lasted at least one week. The committee made its report to the delegates to the Convention at a regular assembly. The report was full and fair and appears in the minutes of the Convention. Based thereon, the

Convention decided and ordered that the work in question be apportioned under the 1933 agreement, thus nullifying the 1948 contract.

■ Criticism of the understanding, ability, disposition, attention to duty, etc., on the part of the Triennial Convention, the Committee, the Grand Chief Engineer, or any agent utilized in understanding and determining the controversy, avails appellee-plaintiffs nothing. These were the arbiters to which they agreed when they became union members or adopted the union constitution. Mistake of an agreed arbiter in a conclusion, by way of quasi-judgment, is not arbitrary and capricious action. These terms, when used in connection with a situation such as is before us, must mean willful and unreasoning action, action without consideration and in disregard of the facts and circumstances of the case. Action is not arbitrary and capricious when exercised honestly and upon due consideration, where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached. Sweitzer v. Industrial Ins. Commission of Washington, 1921, 116 Wash. 398, 199 P. 724. See 6 C.J.S. Arbitrary, p. 145; 6 C.J.S. Arbitration and Award § 29, p. 169 (Consummated arbitration agreement)—Effect on Right to Bring Action, and § 105, p. 251 (Operation and effect of arbitration award) —Mistake or Error; 3 Am.Jur., "Arbitration and Award", "V. The Award", subd. "D. Grounds for Impeachment, Vacation, or Modification of Award", p. 958 et seq., sec. 135 et seq.

There was no evidence that there existed or that appellee-plaintiffs sustained any prejudice from arbitrary or capricious action.

Because of the possibility that we err in our opinion that the judgment of the trial court be reversed and rendered, as premised upon the foregoing discussion, we mention an additional matter made a point of error, which, in our opinion, presents reversible error which would require the remand of the cause to the trial court.

■ The contention under the point of error is that under the circumstances of the case the special issue constitutes a submission of a question of law to the jury for determination. It is pointed out that the question of whether or not the 1933 agreement covered the allocation of work on the "Dallas-Irving Switchers" was a matter for factual determination in that it would be controlled by whether the activity generating the work was or was not "in the territory" between Fort Worth and Teague as applied to railroad freight service for which the work was allocated under the agreement. Necessarily, in order for the jury to reach the question of whether the union arbiter's decision was arbitrary and capricious, it must first decide that such work was not in the territory covered within the contemplation of the contract, for if it decided that the work was in the territory so covered the 1933 contract would have application as a matter of law and the union arbiter's decision and quasi-judgment, even though capriciously determined, would, of necessity, have been correct as a matter of law. Objections to the issue included the contention that it submitted a question of law, necessarily called for the jury to interpret the 1933 agreement, assumed that the 1933 agreement was not applicable to the "Dallas-Irving Switchers", failed to submit component elements of the ultimate issue, etc.

It must be remembered that appellee-plaintiffs were burdened to establish their grounds of "defense" to the decision of the arbiter. Entry of judgment in their behalf based upon the answer to the single special issue submitted would be upon discharge of a lesser burden of proof than required by law in such an instance—in that a correspondingly greater burden than required by law was placed upon adverse parties, construction of the contract in this case involving determinations of fact to be made by the jury, in light of which the court

would be enabled to apply its legal construction. 10–A Tex.Jur., p. 405, "Contracts", sec. 198, "Construction by Court or Jury" (see 13 Tex.Jur.2d., p. 263, sec. 110, "Function of court and jury").

The remaining points of error presented to us have been examined and in our opinion fail to present reversible error. They are therefore severally overruled.

For reasons heretofore stated, the judgment of the trial court is reversed and judgment here rendered that appellee-plaintiffs take nothing by their suit.

BOYD, J., not participating.